# Judge Hellerstein

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



|  |  |
|---|---|
| EMET INVESTMENTS, LLC,<br>a Nevis limited liability company,<br><br>Plaintiff,<br><br>—against—<br><br>NATIONS ACADEMY LLC,<br>a Delaware limited liability company,<br>GLOBAL EDUCATION MANAGEMENT<br>SYSTEMS LIMITED,<br>a British Virgin Islands corporation, and<br>GEMS AMERICAS, INC.,<br>a Delaware limited liability company,<br>SUNNY VARKEY,<br>an individual Dubai resident,<br>CHRISTOPHER WHITTLE,<br>an individual New York resident,<br>SRINIVASAN KRISHNAN,<br>an individual Dubai resident,<br><br>Defendants. | Civil Action No.<br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiff Emet Investments, LLC ("Emet") through its attorneys Brune & Richard

LLP, alleges as follows:

### NATURE OF ACTION

1.     This action arises out of a brazen fraud committed by a purported international,

for-profit education venture and its officers, directors, successors and alter egos, through which

the plaintiff Emet was swindled out of more than five million dollars.  In reasonable reliance

upon numerous written and oral misstatements made by the defendants, Emet executed a

Subscription Agreement whereby it agreed to make a cash capital contribution of $5 million to

Nations Academy LLC ("Nations"), in exchange for shares of preferred stock in Nations.  The

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

shares, however, would never be issued. The Subscription Agreement, and the numerous oral

and written communications that accompanied it, were a fraud perpetrated to line the pockets of

the defendants at the plaintiff's expense.

2.      Upon discovering the fraud, Emet requested the return of its $5 million. When

Nations and its principals refused to return the money, Emet, through its counsel, made a formal

demand for its return. To avoid a lawsuit, defendant Sunny Varkey, one of the founders of

Nations and the driving force behind the fraudulent scheme perpetrated by the defendants,

entered into a Settlement Agreement and executed a Promissory Note (a true and correct copy of

which is attached hereto as Exhibit 1), pursuant to which Varkey agreed to pay back Emet's $5

million plus interest, in consideration of Emet's agreement to forego commencing a legal action

against the defendants.

3.      Varkey's promise to pay was unconditional and irrevocable. He waived any

defenses to enforcement of his obligations and agreed to pay all of Emet's costs and expenses

incurred in enforcing its rights under the Promissory Note. But the promise was nothing more

than a perpetuation of defendants' fraud. In blatant disregard of the agreed-upon terms of the

Settlement Agreement and Promissory Note, Varkey failed to pay the amount due on the date set

forth in the agreements. To date, Varkey has failed to pay Emet any of the $5 million in

principal, plus interest, that he is personally obligated to pay.

4.      Varkey and the other defendants, having recognized their obligation to make

Emet whole for the shares of preferred stock that Emet was fraudulently induced to buy, but

which were never delivered, have since been engaged in a pattern of behavior designed to

perpetuate the fraud, frustrate Emet, and avoid liability. Specifically, Varkey and the other

defendants have formed new corporate entities, given indebted entities new names and/or used

- 2 -

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

shell corporations in a transparent effort to hide or shield the very assets from which Emet is entitled to recover.

5.     Defendants' fraud, willful and continued obfuscation, and outright refusal to adhere to the terms of binding agreements cannot be permitted.  By this Complaint, Emet seeks to end Varkey's international shell game and mocking disregard for the rule of law.

## PARTIES

6.     Plaintiff Emet Investments, LLC ("Emet") is a Nevis limited liability company, formed by the trustee of a foreign trust (the "Trust"), for the purpose of holding the $5 million investment that is the subject of this action in its name as nominee for the trustee.  The trustee is the only member of Emet and Counselor Trust reg. is its Manager.  Lynn Tilton is the beneficial owner of the Trust, has a beneficial ownership interest in the Emet structure, and at all relevant times was acting in that capacity.

7.     Upon information and belief, defendant Nations Academy LLC is a limited liability company organized and existing under the laws of the State of Delaware, is or was duly authorized to conduct business within the state of New York, with its principal place of business located at 767 Third Avenue, New York, New York.  Upon information and belief, defendants Varkey and Christopher Whittle were directors of Nations from its inception until at least September 2008; Dino Varkey was a director of Nations beginning on or about August 26, 2008; and Manny Rivera was a director of Nations beginning on or about September 1, 2008.  In or around November 2008, Nations' board of directors voted to change the name of Nations Academy LLC to GEMS Americas LLC.  In the alternative, Defendant GEMS Americas Inc. ("GEMS Americas"), a Delaware corporation incorporated on January 15, 2009, is the successor of Nations, maintaining offices at 767 Third Avenue, New York, New York.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

8.     Upon information and belief, defendant Global Education Management Systems Limited ("GEMS"), also doing business as GEMS Education, is a British Virgin Islands corporation controlled by Sunny Varkey, duly authorized to conduct business within the State of New York, and maintains offices at 767 Third Avenue, New York, New York. Defendant GEMS shares the same corporate address as defendants Nations and GEMS Americas, owns a controlling interest in the stock of defendants Nations and GEMS Americas, shares common and overlapping management with defendants Nations and GEMS Americas, and dominates and controls defendants Nations and GEMS Americas.

9.     Upon information and belief, defendant Sunny Varkey is a resident of Dubai, and is Founder and Chairman of GEMS, which in turn owns and controls Nations and GEMS Americas as described above.

10.     Upon information and belief, defendant Christopher Whittle is a resident of New York, New York, Founder and Chairman of Edison Schools, one of the original investors in Nations, and was the President and Chief Executive Officer of Nations from its inception until in or around September 2008.

11.     Upon information and belief, defendant Srinivasan Krishnan is a resident of Dubai, and was the Chief Operating Officer of the Varkey Group, the parent company of GEMS and GEMS Americas, from its inception and through at least 2008. Currently, Mr. Krishnan is Executive Director, Pacific Rim, East Asia and China Region for GEMS.

## JURISDICTION AND VENUE

12.     This action asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the claims under the Exchange Act.

13. Venue is appropriate in this District under 28 U.S.C. §§ 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Many of the acts alleged herein, and the acts giving rise to defendants' misconduct, occurred in substantial part in this District. Moreover, Paragraph 12 of the Promissory Note dated February 17, 2010, executed by Sunny Varkey, provides that any suit or proceeding related to that Note shall be commenced exclusively in state or federal courts located in New York County, New York, and Mr. Varkey explicitly consented to the exclusive jurisdiction and venue of such courts.

14. In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, email, and the facilities of a national securities exchange.

## STATEMENT OF FACTS

15. Sunny Varkey is a Dubai-based entrepreneur and multi-millionaire at the helm of the Varkey Group – a multinational corporation with interests in construction, healthcare and education. Varkey's for-profit education empire is run under the GEMS arm of the Varkey Group. A self-described "educational management consultancy and systems provider, offering total education management solutions," GEMS currently manages a network of more than 100 private international for-profit schools in the Middle East – in Dubai, Abu Dhabi, Fujairah,

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

Sharjah, Saudi Arabia, Qatar, Jordan and Libya – and in the United Kingdom, India, and South Africa. The annual revenue of Varkey's education business has been estimated at $500 million.

16.     On January 9, 2007, Varkey and GEMS announced the formation of Nations Academy – an alliance between GEMS and New York-based education company Edison Schools to extend the GEMS network of for-profit elite private schools into the United States. Former owner of Esquire magazine and founder of Edison Schools, Chris Whittle, would be Nations' President and CEO, and Benno Schmidt, former Yale President and partner of Whittle's in Edison Schools, would be the Chairman of its Board.

17.     What Varkey and Whittle purportedly set out to accomplish with Nations Academy was costly and ambitious – a chain of multi-million-dollar for-profit private schools in cities around the world offering an international curriculum from pre-kindergarten through high school. Nations' stated goal was to have 60 campuses worldwide by 2021, which they hoped would produce up to $3 billion in annual revenue. The first two schools under the Nations banner were to open in the fall of 2010 and would be located in New York City and Washington D.C., followed by four others in 2011 and six in 2012, in cities including London, Shanghai, Paris, Hong Kong and Los Angeles. The schools would cater to the children of a mobile elite of expatriates, diplomats and international businesspeople who regularly have to uproot their families, and who would be drawn by the schools' focus on instilling a global perspective.

18.     By March 2008, Varkey and Whittle had committed to and publicly announced arrangements to acquire two parcels of land on which to build Nations' first two schools – a property on West 57th Street in Manhattan held by the Durst Organization (the "Durst Property") and the former Gilbert Grosvenor Estate in Bethesda, Maryland. Nations had planned to begin construction on those first two schools in 2009.

- 6 -

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

19.     But Nations was in a very precarious financial condition from the start, and by

May 2008 it was readily apparent to Nations, GEMS, Varkey and Whittle that their partnership

and its quixotic plans would not survive the year.  Edison and GEMS had together invested over

$10 million in Nations, but they had been unable to attract any third-party investment and their

contributions were exceeded by the company's significant annual expenses.  For the fiscal year

ending March 2008 Nations had nearly $11 million in expenses including the following line-

items:

| | |
|---|---|
| Consulting | $974,875 |
| Travel & Entertainment | $1,117,483 |
| Development | $1,422,489 |
| Professional Fees | $2,802,346 |
| Payroll | $3,068,088 |

20.     On top of an initial capital investment of $6.85 million, Varkey, through GEMS,

loaned an additional $5 million to Nations in February of 2008, but upon information and belief,

by May 2008, that money had been used to pay day-to-day expenses.  Under the terms of the

land deal with the Durst Organization, two or three $10 million deposits were due between

March and December of 2008.  Nations had planned to finance that land deal through a $400

million municipal bond offering, but by at least March of 2008, defendants knew or recklessly

disregarded that no such offering could be completed in the then-current market.

21.     In a desperate attempt to staunch Nation' mounting losses and recover some of

what defendants had already poured into Nations, and knowing that their plans could not

possibly succeed, Varkey approached Lynn Tilton, the founder and CEO of Patriarch Partners, a

private equity firm headquartered in New York City, to "invest" in Nations.  Varkey intended to

exploit -- and did exploit -- the relationship of respect and trust he had cultivated with Ms. Tilton

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

to induce her to part with $5 million on the strength of his reputation and assurances that his representations about Nations, and his own plans to invest in it, could be trusted. The ruse succeeded.

22.     Between February and June of 2008, in discussions in New York and Dubai between Tilton and Varkey, Whittle, and Krishnan, by telephone, by email, and in person – including at a dinner hosted by Varkey in Dubai on or about May 10, 2008, at a dinner in New York at the Four Seasons Restaurant, and in numerous emails and telephone calls to Tilton in New York – defendants made false and misleading statements, and omitted material information with specific intent to thereby fraudulently obtain $5 million for their own use and benefit. Those representations include, *inter alia*, the claims that:

    (a)    Nations had a clear vision, and experienced and committed leadership team in Varkey, Whittle and Benno Schmidt, and committed financial backers in Edison and GEMS;

    (b)    Nations was in contract on the two properties in New York and Maryland, and construction was set to begin in 2009;

    (c)    Financing the deal on the New York property would require finalizing a municipal bond deal, which was imminent, and for which the necessary preparations had been made;

    (d)    Varkey, through GEMS, would be making a $35 million cash capital contribution to Nations alongside the $5 million sought from Tilton;

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

(e)    The combined $40 million "investment" would buy 72,727 shares of preferred stock in Nations, and would be invested in the New York and Maryland projects;

(f)    Nations would seek an additional $60 million of funding through a second tranche of preferred stock to be issued following the close of the $40 million offering, and Varkey had additional investors lined up.

23.    Defendants knew or recklessly disregarded that, contrary to their representations, the obstacles Nations faced were insurmountable. Defendants did not tell Tilton that: Nations would neither issue nor deliver the promised shares of preferred stock, nor any shares; Varkey had no intention of making and would not make the $35 million investment in Nations; to finance the New York deal, Nations would have to complete a $400 million bond deal – far in excess of what the market would support – and that no investors had yet been identified; Varkey and Whittle were having serious disagreements about the ownership, management and future of Nations, and Whittle's days at Nations were numbered. In fact, Nations would be seeking no additional investment. Instead, Varkey, through GEMS, would be collecting a $1 million annual monitoring fee, payable quarterly, to preside over Nations' demise. The $5 million investment would not go into two schools to be opened in the U.S. – it would go straight into Varkey's and the other defendants pockets. This information was knowingly and intentionally hidden from Ms. Tilton for the purpose of obtaining a $5 million investment on the strength of Mr. Varkey's and the other defendants' misrepresentations.

24.    In reasonable reliance on defendants' representations, Tilton presented the Nations investment opportunity to the trustee for the Trust of which she was the beneficial

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

owner. At the very first meeting where a potential investment in Nations was discussed, Tilton

had told Varkey that any investment in Nations would be made by such a trust. On May 29,

2008, Trust counsel, Elizabeth Schurig and Michael Ripp, attorneys at the firm Giordani Schurig

Beckett & Tackett LLP, advised Laura Eshbaugh, vice president of Nations and a long-time

colleague of Whittle's, that the $5 million investment in Nations solicited by defendants would

be made from the Trust's assets. On June 12, 2008, the trustee formed Emet for the purpose of

investing $5 million of the Trust's assets in Nations. Tilton relayed to Counselor Trust reg.,

Manager of Emet, in substance and in form, the statements made to her by defendants regarding

Nations, and Counselor Trust reg. reasonably relied upon, *inter alia*, the misstatements and

omissions made to Tilton and relayed to it in deciding to cause Emet to invest in Nations. By at

least May 29, 2008, defendants were aware that the $5 million investment was being made with

the Trust's assets and at all relevant times, defendants acted with the intent to fraudulently induce

Tilton and/or Emet to invest in Nations.

### Defendants' Misrepresentations Were Reiterated and Memorialized in Written Agreements and Promotional Materials Provided to Tilton and Emet.

25.     On May 29, 2008, Whittle sent Tilton a purported Subscription Agreement for the

sale of Series A Preferred Stock; a signature page for the Nations Operating Agreement, which

he explained would be amended to reflect the combined $40 million investment of Emet and

GEMS; an Investor Questionnaire; and wire instructions, which directed Tilton to wire the $5

million investment to Regions Bank Birmingham. Tilton forwarded the deal documents to

Schurig and Ripp, counsel for Emet and the Trust. At Trust counsel's request, Eshbaugh sent

Tilton and counsel for the Trust a draft of the Nations Operating Agreement, amended to reflect

the terms of the contemplated offering.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

Subscription Agreement

26. REDACTED

27. REDACTED

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

28.  

### Amended and Restated Operating Agreement

29.     The Operating Agreement of Nations that was sent to Tilton and Emet's counsel provided:

        (a)    "The purpose of the Company is to invest in and manage and operate one or more entities which (i) build, own, operate, and manage or (ii) manage private schools for ages three through eighteen, initially in the United States, Europe and South America, then globally in major world cities…"

        (b)    Issuance of Series A Preferred Shares would occur in two tranches. The "Tranche I Issuance" would take place on or around the Effective Date of the agreement, for an aggregate purchase price of $40 million.

        (c)    "Each Member shall execute a counterpart of this Agreement or a joinder letter in the form of Exhibit B, and a Person shall be admitted as a Member of the Company at the time (i) such Person has made the Capital Contribution, as agreed by such Person in writing, and (ii) this Agreement or a joinder letter in the form of

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

Exhibit B is executed and delivered to the Company by such

Member and agreed to in writing as accepted by the Company."

30.    Consistent with the Subscription Agreement, Exhibit A to the Operating

Agreement set out capital contributions and shareholding of the Members of Nations after

Tranche 1:

## EXHIBIT A

### CAPITAL CONTRIBUTION AND SHARES

| Member | Capital Contribution | Series A Preferred Shares | Common Shares |
|---|---|---|---|
| Global Education Management Systems Limited<br>P.O. Box 8607<br>Dubai<br>United Arab Emirates<br>Facsimile: 9714.340.3686<br>Attention: General Counsel | $46,850,000* | 62,629 | 78,000 |
| Edison Schools Inc.<br>521 Fifth Avenue, 11th Floor<br>New York, NY 10175<br>Facsimile: 212.419.1706<br>Attention: General Counsel | $3.330,000 | | 17,317 |
| H. Christopher Whittle<br>Suite 1230, 800 S. Gay St.<br>Knoxville, TN 37029<br>Facsimile: 865.546.1090 | $25 | | 4,683 |
| Emet Investments, LLC | $5,000,000 | 9,091 | |
| Reserved for Management Team | | | TBD |

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

31.     The $46,850,000 listed as GEMS' capital contribution included the $35 million investment it would be obligated to make as part of Tranche I.  The Operating Agreement required that it be made in installments:

> (a)     Exhibit A to the Operating Agreement represented that $22,850,000 had already been contributed by GEMS: "$6,850,000 contributed between March 2007 and March 2008; $5,000,000 contributed February 2008; $10,000,000 contributed April 2008; $500,000 contributed May 2008; $500,000 contributed June 2008."

> (b)     Exhibit A provided that the remaining $24 million of GEMS' capital contribution would be made as follows:

| July 1, 2008 | $2,500,000 |
| August 1, 2008 | $2,500,000 |
| September 1, 2008 | $12,500,000 |
| October 1, 2008 | $2,500,000 |
| November 1, 2008 | $2,500,000 |
| December 1, 2008 | $1,500,000 |

32.     The Subscription Agreement and Operating Agreement (together, the "Agreements") were each materially false and misleading because, *inter alia*, they did not disclose that: Nations would neither issue nor deliver preferred shares; Varkey had no intention of making a $35 million investment in Nations and would not make that investment; Nations would be seeking no additional investment; and Emet's investment would not go into two schools to be opened in the U.S.

<u>Misleading Promotional Materials</u>

33.     On June 3, 2008, Michael Ripp, counsel for Emet, received from Ms. Eshbaugh a package of promotional materials about Nations for the Emet trustee to review (the "Promotional

- 14 -

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

Materials"). Those materials touted the experience and expertise of Whittle and Schmidt, the

success of Edison and GEMS, and emphasized Nations' firm plans to acquire the land for, and

develop, the New York and Maryland schools.

34.    The Promotional Materials included a Nations marketing brochure that, among

other things, described Whittle, Schmidt and Varkey as the committed leadership team behind

Nations:

> **Chris Whittle – CEO**
> was publisher of Esquire Magazine and founder of Channel One. He founded and
> remains Chairman of Edison Schools, the leading US manager of public schools and
> school district.
>
> **Benno Schmidt – CHAIRMAN**
> was President of Yale University and Dean of Columbia University Law School. He
> currently serves as Education Advisor to China's Jiangsu province. He remains Vice
> Chairman of Edison Schools, and also serves as Chairman of the City University of New
> York.
>
> **Sunny Varkey – BOARD MEMBER**
> founded GEMS which has schools in the United Kingdom, India and the Middle East.
> He has won various awards for his work including Outstanding Asian Businessman of the
> Year in 2007 and the CEO Middle East Award for Corporate Social Responsibility.

35.    The Promotional Materials included a January 9, 2007 Press Release, which

stated, among other things:

> The new alliance unites two of education's most prominent entrepreneurs and pioneers:
> Chris Whittle, who founded Edison Schools, and Sunny Varkey, founder of Global
> Education Management Systems. Chris Whittle becomes CEO of the new private
> schools company.

36.    The Promotional Materials included a June 23, 2007 *Financial Times* article titled

"Global Network of Schools Planned," which stated, among other things, that: "The company

would not reveal the level of funding it has secured but said it had enough money in place for the

initial work."

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

37.     The Promotional Materials included a December 8, 2007 *Washington Post* article
about Nations' purchase of the Gilbert Grosvenor estate in Bethesda, Maryland, titled "Buyers of
Montgomery Estate Plan a 'Global' Private School," which quoted Whittle and a Nations
spokesperson as saying, among other things:

> [W]e have an agreement and … some money has changed hands.
>
>                                        . . .
>
> [N]egotiations for the property began over the summer and … a firm agreement
> [to acquire the property in Maryland] was reached in November.

38.     The Promotional Materials included a February 20, 2008 *New York Observer*
article about Nations' acquisition of the Durst property in New York, titled "Durst to Build
Private School on 11[th] Avenue," which stated, among other things:

> If a zoning change goes through as planned, a $200 million-plus six-story
> competitive primary and secondary school will rise on Mr. Durst's property on
> 623 West 57th Street.
>
> Called the Nations Academy, the venture is being led by Christopher Whittle, the
> founder of education management company Edison Schools … who is partnered
> with former Yale president Benno Schmidt in creating the schools.
>
> Nations Academy will have a long-term lease on the West Side building which
> will be about 240,000 square feet and will be built by the Durst Organization.
>
> Nations is also seeking … more than $200 million in tax-exempt bonds from the
> Industrial Development Authority, a city-administered agency that issues the
> bonds.

39.     The Promotional Materials included a document dated May 14, 2008, titled
"Background on Nations Academy," which stated, among other things:

> Led by Chris Whittle, founder of Edison Schools, and Benno Schmidt, former
> president of Yale University, Nations is backed by two of the world's leading
> education companies – Edison Schools Inc. and Global Education Management
> Systems (GEMS) – which have contributed both capital and senior management
> with significant experience in developing and managing schools.

- 16 -

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

> Flagship location for Nations will be in Manhattan on the block bounded by 58th Street, Eleventh Avenue, 57th Street and Twelfth Avenue, where a new facility will be constructed.
>
> The school facility will be owned and operated by Cities School Network ("CSN").... CSN is in the process of finalizing its application to the New York City IDA for the issuance of tax-exempt bonds for the development of the school .... Closing of the tax-exempt financing is anticipated to occur late in 2008 or 2009 with construction completed in time for the school to open in the fall of 2011.
>
> Nations is presently under contract to acquire a site in Bethesda, MD to open simultaneously with the New York school.

40.     By the time the Promotional Materials were provided to Emet, defendants knew or recklessly disregarded that the representations made in the Promotional Materials about Nations were untrue.  The Promotional Materials were materially false and misleading because, *inter alia*, they did not disclose that to finance the New York deal, Nations would have to complete a $400 million bond deal – far in excess of what the market would support – and that no investors had yet been identified; Varkey and Whittle were having serious disagreements about the ownership, management and future of Nations, and Whittle's days at Nations were numbered; Nations would be seeking no additional investment; plans for the two schools to be opened in the U.S. had already foundered.

41.     Along with the Promotional Materials, Eshbaugh also sent counsel for Emet the Nations financial statements for the fiscal year ending March 31, 2008.  The Nations P&L reflect that Nations' net income during the fiscal year ending March 31, 2008 was nearly negative $11 million.

42.     Those financial statements show that during the fiscal year ending March 31, 2008 Edison made a $3.33 million equity investment, GEMS made a $6.85 million equity investment, and Whittle made a $25 equity investment.  They also reflect a $5 million loan made

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

to Nations by GEMS that enabled Nations to have $3,596,534.65 cash on hand at the end of the period. Eshbaugh told counsel for Emet that the $5 million GEMS loan would be converted to equity and become part of GEMS' $35 million equity investment promised by Varkey as part of the Series A offering.

43.     Those financial statements depict a woefully undercapitalized company, in need of an injection of capital far in excess of the $5 million Emet intended to invest if it was to achieve any of the objectives set out in the promotional materials provided to Emet and described to Tilton by Whittle and Varkey. Emet agreed to part with the $5 million, however, in reasonable reliance on defendants' repeated oral and written misrepresentations, relayed to it by Tilton and memorialized in the Subscription Agreement and the Operating Agreement, that Varkey, through GEMS, would be investing $35 million alongside Emet's $5 million as part of the Tranche 1 issuance.

44.     At the same time, and unbeknownst to Tilton and Emet, the brewing discord between Whittle and Varkey had come to a head. Aware that misrepresentations about his continued involvement in Nations had been made to Tilton to induce her to propose that Emet invest in Nations, Whittle threatened to expose the fraud, including in a memo dated May 27, 2008. That memo stated:

> We are sending the investment documents to Lynn Tilton
> tomorrow morning. As I am sure you would agree, it would not be
> ethical for us to accept her $5mm if there is any chance of our
> relationship coming to an end shortly thereafter. Lynn has shared
> with me that she very much likes the combination of the two of us
> and views our partnership as central to making Nations work.

45.     Before Whittle could make good on his threat to reveal the fraud to Tilton, and in a continuing effort to conceal that Nations was unraveling, Varkey and Krishnan pre-empted Whittle by explaining to Tilton that they were in the process of negotiating a new employment

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

agreement with Whittle and that they would resolve those negotiations and the future of Nations before taking her investment.

**In Reliance on Defendants' False and Misleading Statements, Emet Fully Performs Under the Agreements.**

46.     Emet executed the Agreements on June 16, 2008.  In an email dated June 15, 2008, Eshbaugh had assured counsel for Emet that GEMS and Whittle would co-sign the Agreements on June 16.  They did not.

47.     Unaware of any of the communications regarding Whittle's employment, on the morning of June 17, 2008, counsel for Emet wired $5 million to Nations' account at Regions Bank in Alabama as per Eshbaugh's instructions.  Ms. Tilton herself, however, was aware of the conflict, and was concerned that the relationship between Varkey and Whittle – who formed the heart of Nations' management – was worse than had been reported to Emet.  As a result, Tilton advised Emet to demand return of the $5 million in the afternoon of June 17 and inform Eshbaugh that until Tilton and Emet had received written assurances from Whittle and Varkey that they had resolved their differences and confirmation that Varkey had wired the GEMS funds that were to be invested along with Emet's, Emet was to hold onto the $5 million and the executed Agreements.

48.     Ten days later, on June 27, Varkey told Tilton that the Nations deal was ready to close and Whittle would be in touch to confirm that they had reached agreement regarding his continued employment and with instructions for the wire transfer.  The following day, via email, Whittle confirmed that all was in order for Emet to wire its funds and that he would work with the lawyers to arrange the details.

49.     On June 29, Tilton emailed Varkey to confirm receipt of the above email and to reiterate that Emet was advised not to wire the funds until she heard from him because "you are

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

my relationship and my investment is with and side by side with you." That day, having received the assurances she needed, Tilton advised counsel for Emet to wire the $5 million.

50.     On July 1, 2008, $5 million was wired from Emet's account to Nations' account at Regions Bank in Alabama for the purchase of 9,091 of Series A Preferred Shares.  On that same day, Emet sent Eshbaugh the executed Agreements.

51.     Defendants deliberately concealed from Tilton and Emet that their differences were irreconcilable, that Whittle would be replaced as CEO of Nations within two months, and that defendants would not deliver the shares of preferred stock as promised.  In addition, upon information and belief, Defendants concealed from Tilton and Emet the fact that prior to July 1, 2008, Varkey, through GEMS, had failed to make his most recent capital contribution to Nations, as promised both orally and pursuant to the terms of the Subscription Agreement and the Operating Agreement, and that Varkey and GEMS would not be contributing any more of the promised $35 million investment upon which Emet had reasonably relied in agreeing to make its $5 million investment.

## Defendants Failed to Perform Under the Agreements and Their Fraud Was Gradually Revealed

52.     As of July 1, 2008, Emet had fully performed under the Agreements; Nations acknowledged receipt of both Emet's $5 million and the executed Agreements.

53.     However, contrary to the oral and written representations that had been made to Tilton and Emet and in flagrant breach of the terms of the Agreements:

> (a)     A fully executed copy of the Subscription Agreement or Exhibit B to the Operating Agreement was not – and to date has not been – delivered to Tilton or Emet by Nations, GEMS, Varkey or Whittle. Counsel for Emet made repeated requests for the countersigned

- 20 -

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

Agreements, including by email on July 3, July 10, July 24 and
August 1, 2008, but they were never provided.

(b)     Series A Preferred Shares were not – and to date have not been –
issued or delivered to Emet, at a closing or otherwise.

(c)     Varkey and/or GEMS did not invest the agreed-upon $35 million
in Nations.

(d)     Neither Emet nor Tilton received the quarterly or annual financial
statements as required by Schedule 1 of the Operating Agreement.

54.     Soon after the $5 million was wired to Nations, Tilton started asking about the
status of Emet's investment, for the details of Nations' plans to acquire the Durst property and
for an update on the progress of the planned municipal bond issuance.  In order to monitor
Emet's investment, she joined the Board of Directors of Nations.  It began to become apparent to
Tilton that the picture defendants had painted had been highly misleading.

55.     Between July 1 and August 1, Tilton had numerous conversations with Varkey,
Krishnan, Whittle and Kevin Quinn of Wye River Group (Nations' financial advisors) about
Nations' plans for the bond issuance.  She learned for the first time that in addition to a $10
million deposit already paid to the Durst Organization, a second $10 million installment deposit
was due on the Durst Property on September 15, 2008, and a third on or before December 10,
2008, and that to finance the land deal with the Durst Organization Nations would have to issue
$400 million in debt before closing – a deal ten times larger than any similar non-rated tax-
exempt bond issues that had been successfully completed during the prior eight months – and
contrary to their prior representations, defendants had not made the necessary preparations for

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

such a deal. Tilton discovered that Nations was bleeding money into a land deal it was in no way prepared to complete.

56. On August 26, 2008 at the first Nations board meeting held since Emet's investment, the board voted not to proceed with the Durst deal. Five days later, on September 1, 2008, Mr. Schmidt circulated a memo to the Board with an accompanying resolution, replacing Mr. Whittle as the CEO of Nations with Mr. Manuel Rivera. On September 24, 2008, Nations announced that it would be abandoning the Bethesda Project.

57. As the house of cards defendants had carefully built continued to fall apart, Tilton, surprised and concerned, made repeated requests of Varkey and Krishnan for information about where Emet's $5 million was, how it would be used, and for an update regarding Nations' Business Plan. In response, she was told by Krishnan and Varkey that Nations was regrouping, that Mr. Rivera was in Dubai working on a business plan and that he would present it to the Board soon.

58. On November 3, 2008, a memo was sent to the Nations Board of Directors by Mr. Rivera, scheduling a special telephonic Board meeting on November 7, 2008 at which the Board was to review and approve resolutions replacing Whittle as CEO and director with Rivera and renaming Nations "GEMS Americas LLC". In addition, the board would consider the company's financial position and adoption of the forthcoming business plan. Instead, a day before the scheduled board meeting, Mr. Rivera cancelled it.

59. Despite repeated requests, Varkey and Krishnan's repeated assurances, and contrary to defendants representations and obligations under the Agreements, neither Tilton nor Emet ever received (a) a revised business plan, (b) any information about the financial position of Nations, (c) any information regarding Emet's $5 million investment, (d) executed copies of

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

the Agreements (e) any documentation evidencing the purchase of 9,091 preferred shares or (f) any documentation evidencing GEMS' $35 million investment.

**Defendants Attempt to Conceal Their Fraud and Avoid Liability**

60.     As defendants stalled, deferring Emet and Tilton's requests for information and performance, and declining Tilton's requests for a meeting when she was in Dubai, they dismantled Nations and secreted its assets.  Upon information and belief, in January 2009, a new entity called GEMS Americas Inc. was incorporated in Delaware.  Nations' assets were acquired by GEMS Americas, a member of Varkey's GEMS group of companies, and Nations effectively ceased to exist and/or stopped doing business.  GEMS Americas was a mere continuation of Nations, operating out of the same office at 767 Third Avenue in New York, with Manuel Rivera as its Chairman and CEO and Dino and Sunny Varkey as directors.

61.     In addition, as part of their ongoing attempt to conceal their fraud and avoid the consequences of their breach, defendants tried once again to pray on Tilton's trust in Varkey's reputation:  in response to Tilton's repeated requests for documentation of Emet's investment, Krishnan told Tilton that she need not worry about the lack of documentation because Emet's $5 million investment was personally guaranteed by Mr. Varkey.  Tilton, however, was not reassured and continued to express concern regarding the lack of documentation for Emet's investment.  Krishnan suggested that he could allay her concerns by converting Varkey's personal guarantee into a secured note.  In May of 2009, Krishnan put Tilton in touch with Saibaba Tata, whom he described as Chief Administrative Officer of Nations, to make the necessary arrangements for such a note.

62.     After repeated requests, on June 16, Tilton finally received from Tata Nations' proposed terms for the note – almost a year after Emet wired Nations the $5 million.  The note

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

purchase agreement conceded non-performance under the prior Agreements, stating that "the operating agreement of the company has never been amended to reflect the terms and rights of the Company's Series A Preferred shares."

63.     After months of negotiation, Nations and Emet could not agree on terms for the note.

**Mr. Varkey Irrevocably and Unconditionally Agreed to Return the Proceeds of his Fraud**

64.     On December 24, 2009, Emet formally demanded that its $5,000,000.00, with interest, be returned immediately. That investment had been induced by and made in reliance on representations, written and oral, made by Mr. Varkey and others that Emet now understood to be false and were false when made.

65.     On or about February 17, 2010, Emet, Varkey, Nations, and Tilton executed a Settlement Agreement pursuant to which Varkey agreed unconditionally to repay Emet's $5 million investment plus interest by May 31, 2010. That promise to pay was memorialized by a Promissory Note that obligated Varkey to pay Emet the principal sum of $5 million plus interest at an annual rate of 7% for the period July 1, 2008 through May 31, 2010. In the event Varkey failed to pay any portion of the amounts due by May 31, 2010, interest on the unpaid amounts would accrue at an annual rate of 12%.

66.     In addition, Varkey specifically agreed that upon default, Emet could pursue "any other rights which [Emet] may have pursuant to this Note or applicable law." Varkey also agreed that "[t]he rights and remedies expressly specified in this Note (a) are cumulative and not exclusive of any other rights or remedies which [Emet] otherwise has or would have, (b) may be pursued singularly, successively, or together at the sole discretion of [Emet], and (c) may be exercised as often as the occasion therefore shall occur." Varkey explicitly consented to the

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

exclusive jurisdiction in New York state or federal courts for any suit or proceeding relating to the Promissory Note.

67.     Varkey's payment obligation under the Promissory Note was unconditional, irrevocable, and absolute.  Varkey "irrevocably and expressly waived" all defenses to enforcement of his obligations, including "promptness, diligence, presentment, demand, protest, proof, notice of acceptance, notice of nonpayment, notice of non-performance, notice of non-observance, notice of dishonor, notice of protest, and any and all other notices and demands whatsoever, whether required to be given by statute, rule of law, or otherwise, with respect to" the Promissory Note.  Varkey also agreed to pay Emet all costs incurred in enforcing its obligations under the Promissory Note.

68.     On May 31, 2010, Varkey's payment obligations came due under the Promissory Note and the Settlement Agreement.  Varkey failed to make payment.  To date, Varkey has failed to pay Emet any of the monies he owes pursuant to the Promissory Note and Settlement Agreement.

**Damages**

69.     As a direct and proximate result of defendants' wrongful acts, conduct, statements, and omissions described herein, Emet has incurred the following loss or damages:

(a)     Loss of principal balance invested in Nations pursuant to the Indicative Terms of the Subscription Agreement in the sum of $5,000,000;

(b)     Loss of accrued and unpaid interest pursuant to the Indicative Terms of the Subscription Agreement equal to 8% per annum of

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

the original investment beginning July 1, 2008 and continuing to the present day and to the date of judgment;

(c) Loss of unpaid principal of $5,000,000 as promised to be paid pursuant to the Promissory Note;

(d) Loss of accrued and unpaid interest pursuant to the terms of the Promissory Note equal to 7% per annum of the original investment from July 1, 2008 through May 31, 2010, and 12% per annum from June 1, 2010 and continuing through the present day and to the date of judgment;

(e) Loss of the benefit of the bargain and/or expectancy value, as represented, of the preferred shares, which were never issued as a result of the wrongful acts and omissions of the defendants, as described above;

(f) Loss of alternate investment opportunities and returns that could have been obtained by Emet if it had not been fraudulently induced to invest in Nations;

(g) Legal fees, costs, and expenses; and

(h) Pre-judgment interest as allowed by law

## COUNT I—VIOLATION OF RULE 10B-5 (SECURITIES FRAUD)

### (As Against Nations, Varkey and Whittle)

70. All previous allegations are incorporated herein.

71. Defendants made material misrepresentations and/or omitted material facts necessary to make statements not misleading, including, but not limited to, the following:

- 26 -

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

    (a)    Nations, Varkey and Whittle, acting within the course and scope of their agency, employee, partner, and/or joint venture relationships, participated in, approved, sanctioned, cooperated in, assisted in, consented to, acquiesced in, benefited from, and/or failed to prevent the generation and dissemination of false representations and omissions of material fact in the Subscription Agreement, draft Operating Agreement and the Promotional Materials as described in paragraphs 25 – 40 above;

    (b)    Nations, Varkey and Whittle made material oral and written misrepresentations regarding: Nations' intention to issue shares of preferred stock to Emet, Varkey's investment of $35 million in Nations; Nations' intended use of Emet's investment; Whittle's role with Nations; the dispute between Varkey and Whittle; and additional subjects as described in paragraphs 20-40, 43-46, 48, 51, 57, 58 and 61 above;

72.    At the time the material misrepresentations and omissions were made, defendants Nations, Varkey and Whittle knew them to be false, or recklessly disregarded their falsity, and made them with the intention of causing Tilton to deliver money to Nations, and/or relay that misinformation to Emet so that Emet would deliver money to Nations, under the pretense that Emet would receive shares of preferred stock, all the while knowing that Nations would never issue that stock to Emet and that Varkey would not make the promised $35 million investment in Nations, and in fact had already failed to make a scheduled payment, among other fraudulently concealed facts as described above.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

73.     The material misrepresentations and omissions were made in connection with the sale of securities to Emet, or an agreement to sell securities to Emet, and induced Emet to pay $5 million for shares of preferred stock that were never in fact delivered, although payment was accepted by Nations.

74.     Emet's investment in Nations was done in reliance upon the misrepresentations and omissions of material fact described above.

75.     Emet has suffered economic loss in the form of the $5 million it invested in Nations for shares that were never issued.

76.     Emet's losses were caused by the fraudulent misstatements, including but not limited to, the fraudulent promise by Nations, Varkey and Whittle to deliver shares of stock to Emet in return for its investment.

77.     Emet is therefore entitled to damages caused by this wrongful conduct, in an amount to be determined at trial, but in no less than the amount of principal paid by Emet for the Nations securities that were never issued, any and all interest payments owed pursuant to the terms set forth in the Subscription Agreement, plus any other relief the Court deems just and proper.

### COUNT II—VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT (CONTROL PERSON LIABILITY)

**(As Against Varkey and Whittle)**

78.     All previous allegations are incorporated herein.

79.     As alleged herein, Nations, Varkey and/or Whittle each violated Rule 10b-5 by making untrue statements of material fact and/or omitting material facts necessary to make statements made not misleading, with scienter, in connection with the sale of securities or an agreement to sell securities, upon which Emet reasonably relied, causing Emet economic loss.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

80. Defendants Varkey and Whittle had control of Nations, as evidenced by, *inter alia*, the following:

        (a)    Varkey was, at all relevant times, a board member of Nations and the CEO and Founder of GEMS, which held a significant equity interest in Nations. Varkey had the power to influence Nations and exercised that power by controlling Nations' strategy and activities. Varkey was aware of the false and misleading statements made to Tilton and Emet;

        (b)    Whittle was, from 2007 through approximately September 1, 2008, the President and CEO of Nations and the Founder of Edison, which held a significant equity interest in Nations. Whittle had the power to influence Nations and exercised that power by speaking on behalf of Nations in the press and presenting himself as the public face of Nations. Whittle was aware of the false and misleading statements made to Tilton and Emet;

81. Defendants Varkey and Whittle were culpable participants in the fraud perpetrated by Nations, as evidenced by, *inter alia*, the following:

        (a)    Defendants Varkey and Whittle made numerous oral and written communications to Tilton and/or Emet that contained untrue statements of material fact and omissions that made what was said misleading, with the intention of inducing Emet to invest in Nations as described in paragraphs 20-40, 43-46, 48, 51, 57, 58 and 61 above.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

82.    Emet is therefore entitled to damages caused by this wrongful conduct, in an amount to be determined at trial, but in no less than the amount of principal paid by Emet for the Nations securities that were never issued, any and all interest payments owed pursuant to the terms set forth in the Subscription Agreement, plus any other relief the Court deems just and proper.

## COUNT III—COMMON LAW FRAUD

### (As Against Nations, Varkey and Whittle)

83.    All previous allegations are incorporated herein.

84.    Defendants made material misrepresentations and/or omitted material facts necessary to make statements not misleading, including, but not limited to, the following:

(a)    Nations, Varkey and Whittle, acting within the course and scope of their agency, employee, partner, and/or joint venture relationships, participated in, approved, sanctioned, cooperated in, assisted in, consented to, acquiesced in, benefited from, and/or failed to prevent the generation and dissemination of false representations and omissions of material fact in the Subscription Agreement, draft Operating Agreement and the Promotional Materials as described in paragraphs 25-40 above;

(b)    Nations, Varkey and Whittle made material oral and written misrepresentations regarding: Nations' intention to issue shares of preferred stock to Emet, Varkey's investment of $35 million in Nations; Nations' intended use of Emet's investment; Whittle's role with Nations; the dispute between Varkey and Whittle; and

- 30 -

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

additional subjects as described in paragraphs 20-40, 43-46, 48, 51, 57, 58 and 61 above.

85.   At the time the material misrepresentations and omissions were made, defendants knew them to be false, or recklessly disregarded their falsity, and made them with the intention of causing Tilton to deliver money to Nations, and/or relay that misinformation to Emet so that Emet would deliver money to Nations, under the pretense that Emet would receive shares of preferred stock, all the while knowing that Nations would never issue that stock to Emet and that Varkey would not make the promised $35 million investment in Nations.

86.   Defendants were aware that the false information would be used by Tilton and Emet, known parties, for the particular purposes described herein.  Thus, defendants knew, intended, and understood that Tilton and Emet would act or decide not to act in reliance on such representations and omissions.

87.   Emet and Tilton received and reasonably relied on the false representations and omissions of material fact for the particular purposes described herein.

88.   Tilton's and Emet's reliance was foreseeable and was justified.

89.   Tilton's and Emet's reliance caused pecuniary loss to Emet as alleged herein.

90.   Emet is therefore entitled to damages caused by this wrongful conduct, in an amount to be determined at trial, but in no less than the amount of principal paid by Emet for the Nations securities that were never issued, any and all interest payments owed pursuant to the terms set forth in the Subscription Agreement, plus any other relief the Court deems just and proper.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

## COUNT IV—FRAUD IN THE INDUCEMENT

### (As Against Nations, Varkey and Whittle)

91.    All previous allegations are incorporated herein.

92.    Defendants made material misrepresentations and/or omitted material facts necessary to make statements not misleading, including, but not limited to, the following:

        (a)    Nations, Varkey and Whittle, acting within the course and scope of their agency, employee, partner, and/or joint venture relationships, participated in, approved, sanctioned, cooperated in, assisted in, consented to, acquiesced in, benefited from, and/or failed to prevent the generation and dissemination of false representations and omissions of material fact in the Subscription Agreement, draft Operating Agreement and the Promotional Materials as described in paragraphs 25-40 above;

        (b)    Nations, Varkey and Whittle made material oral and written misrepresentations regarding: Nations' intention to issue shares of preferred stock to Emet, Varkey's investment of $35 million in Nations; Nations' intended use of Emet's investment; Whittle's role with Nations; the dispute between Varkey and Whittle; and additional subjects as described in paragraphs 20-40, 43-46, 48, 51, 57, 58 and 61 above.

93.    At the time the material misrepresentations and omissions were made, defendants knew them to be false, or recklessly disregarded their falsity, and made them with the intention of causing Tilton to deliver money to Nations, and/or relay that misinformation to Emet so that

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

Emet would deliver money to Nations, under the pretense that Emet would receive shares of preferred stock, all the while knowing that Nations would never issue that stock to Emet and that Varkey would not make the promised $35 million investment in Nations.

94.     Defendants were aware that the false information would be used by Tilton and Emet, known parties, for the particular purposes described herein.  Thus, defendants knew, intended, and understood that Tilton and Emet would act or decide not to act in reliance on such representations and omissions.  Defendants intended to induce Emet to invest in Nations.

95.     Emet and Tilton received and reasonably relied on the false representations and omissions of material fact for the particular purposes described herein.

96.     Tilton's and Emet's reliance was foreseeable and was justified.

97.     Tilton's and Emet's reliance caused pecuniary loss to Emet as alleged herein.

98.     Emet is therefore entitled to damages caused by this wrongful conduct, in an amount to be determined at trial, but in no less than the amount of principal paid by Emet for the Nations securities that were never issued, any and all interest payments owed pursuant to the terms set forth in the Subscription Agreement, plus any other relief the Court deems just and proper.

## COUNT V—AIDING AND ABETTING FRAUD

### (As Against Whittle and Krishnan)

99.     All previous allegations are incorporated herein.

100.    Nations, Varkey and Whittle made fraudulent statements and/or omissions of material fact to Emet, as fully described above.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

101.    At all relevant times, defendants Whittle and Krishnan were aware that Nations, Varkey and/or Whittle were making the fraudulent misstatements and/or omissions of material fact to Tilton and/or Emet described above.

102.    Defendants Whittle and Krishnan aided and abetted Nations', Varkey's and Whittle's fraud by substantially assisting the primary wrong by, including but not limited to, the following:

> (a)    Participating in the drafting of the Subscription Agreement;
>
> (b)    Engaging in oral and written communications with Tilton and/or Emet for the purpose of inducing Emet to invest in Nations; and
>
> (c)    Defendant Whittle aided in the public dissemination of information about Nations in order to create the false impression that Nations was in fact a legitimate business engaged in the business of opening and running international schools, for the purpose of inducing Emet to invest in Nations.

103.    Emet is therefore entitled to damages caused by this wrongful conduct, in an amount to be determined at trial, but in no less than the amount of principal paid by Emet for the Nations securities that were never issued, any and all interest payments owed pursuant to the terms set forth in the Subscription Agreement, plus any other relief the Court deems just and proper.

## COUNT VI—BREACH OF CONTRACT (SUBSCRIPTION AGREEMENT)

### (As Against Nations and Varkey)

104.    All previous allegations are incorporated herein.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

105.    Defendants Nations and Varkey entered into a valid and binding contract with Emet in the form of the Subscription Agreement, pursuant to which Nations was to issue 9,091 shares of preferred stock to Emet in return for $5,000,000.  Although the Subscription Agreement was never executed by Nations or Varkey, Nations and/or Varkey accepted payment of the $5,000,000 from Emet, thus accepting the offered cash payment and forming a binding contract for the preferred shares.

106.    Emet performed its obligation under the contract by paying Nations $5,000,000 and delivering to Nations executed copies of the Subscription Agreement and Exhibit B to the Operating Agreement.

107.    Defendants Nations and/or Varkey breached the contract because they failed to issue and/or deliver the promised shares of preferred stock in Nations to Emet and failed to perform other obligations as described in paragraph 53, as required by the Subscription Agreement.

108.    Emet was damaged by the breach because it was induced to pay $5,000,000 to Nations but was never given the benefit it had bargained for in the form of the preferred shares and the payments to be made and other bargained-for rights under terms of the Subscription Agreement.

109.    Emet is therefore entitled to damages caused by this wrongful conduct, in an amount to be determined at trial, but in no less than the amount of principal paid by Emet for the Nations securities that were never issued, any and all interest payments owed pursuant to the terms set forth in the Subscription Agreement, plus any other relief the Court deems just and proper.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

## COUNT VII—UNJUST ENRICHMENT

### (As Against Nations, Varkey and Whittle)

110.    All previous allegations are incorporated herein.

111.    Defendants Nations, Varkey and/or Whittle were enriched by the $5,000,000 wired to them from Emet.

112.    That enrichment was at the expense of Emet, which was the entity that wired the money and had legal ownership of the money prior to being fraudulently induced into sending it to Nations.

113.    Defendants Nations', Varkey's and/or Whittle's retention of that money without providing Emet with the shares of preferred stock promised is unfair and inequitable, and it offends equity to allow them to continue to hold Emet's money.

## COUNT VIII—CONSTRUCTIVE TRUST

### (As Against Nations, Varkey and Whittle)

114.    All previous allegations are incorporated herein.

115.    Defendants Nations, Varkey and/or Whittle had a duty, due to the special relationship created between them and Tilton as a result of their stated intention to bring Tilton in to Nations as a major shareholder, board member and business partner, to give correct information regarding, among other matters, Nations' business, Varkey's investment of $35 million in Nations and the issuance of shares of preferred stock to Emet.

116.    Defendants Nations, Varkey and/or Whittle made certain promises regarding Nations, including, but not limited to:

> (a)    Defendant Varkey promised to invest $35 million of his own funds through GEMS in Nations;

- 36 -

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

      (b)      Defendants Nations, Varkey and/or Whittle promised to issue shares of preferred stock in Nations in return for Emet's $5 million investment in Nations; and

      (c)      Defendants Nations, Varkey and/or Whittle promised to use any money invested by Emet to fund the building and opening of two new schools in the United States.

117.    In reasonable reliance on those promises, Emet transferred $5 million to Nations.

118.    Defendants Nations, Varkey and/or Whittle were unjustly enriched as a result, as fully described above.

119.    There exist grounds for the imposition of a constructive trust in favor of Emet, senior in right to each defendant, against Nations purported assets and against the ownership interests held by each defendant in the assets or in the entity or entities which currently own such assets, in a form or amount sufficient to repay the debt owed to Emet.

## COUNT IX—CONVERSION

### (As Against Nations, Varkey and Whittle)

120.    All previous allegations are incorporated herein.

121.    Defendants Nations, Varkey and/or Whittle induced Emet to send to Nations $5,000,000 through fraudulent means.

122.    Emet is the legal owner of the specifically identified $5,000,000 wired to Nations in reasonable reliance upon the fraudulent misrepresentations and omissions of Nations, Varkey and/or Whittle, and it has an immediate right of possession of that $5,000,000.

123.    Defendants Nations, Varkey and/or Whittle have exercised unauthorized dominion over the $5,000,000 paid by Emet to the exclusion of Emet's rights by accepting the

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

payment of the $5,000,000 with the intent to defraud Emet and by refusing to return the money to Emet despite Emet's repeated demands to be repaid.

124.    Emet is therefore entitled to damages caused by this wrongful conduct, in an amount to be determined at trial, but in no less than the amount of principal paid by Emet for the Nations securities that were never issued, any and all interest payments owed pursuant to the terms set forth in the Subscription Agreement, plus any other relief the Court deems just and proper.

## COUNT X—SUCCESSOR LIABILITY

### (As Against Nations and GEMS Americas)

125.    All previous allegations are incorporated herein.

126.    Upon information and belief, GEMS Americas acquired all of the assets of Nations.

127.    Upon information and belief, Nations ceases to exist.

128.    Upon information and belief, defendants Varkey and GEMS did own a controlling stake in Nations and continue to own a controlling stake in GEMS Americas.

129.    The transfer of assets from Nations to GEMS Americas was done for the fraudulent purpose of rendering Nations judgment proof to its creditors, including Emet, who was defrauded by defendants Nations, Varkey and Whittle.

130.    The transfer of assets from Nations to GEMS Americas was a de facto merger.

131.    GEMS Americas is the mere continuation of Nations.

132.    Emet is therefore entitled to recover any damages and any other relief the Court deems just and proper from GEMS Americas, the successor of Nations.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

## COUNT XI—ALTER EGO LIABILITY

### (As Against Nations and GEMS)

133.    All previous allegations are incorporated herein.

134.    GEMS, through its chairman and CEO Varkey, exercised complete domination and control over Nations, to the extent that Nations had no independent significance of its own, but was the mere alter ego of GEMS.

135.    GEMS and Varkey used the corporate structure of Nations in order to perpetrate a fraud on Emet.  Nations was the vehicle through which GEMS and Varkey fraudulently induced Emet to invest the $5 million that forms the basis of this suit.  GEMS and Varkey sought to insulate themselves from judgment by creating a separate corporate form to shield themselves from liability.

136.    The hallmarks of alter ego liability are present in the relationship between Nations and GEMS:

> (a)    The two companies have several overlapping directors, such as Varkey, Manuel Rivera and Dino Varkey, Sunny Varkey's son;
>
> (b)    Nations was clearly undercapitalized, as evidenced by, among other things, Varkey's and GEMS' decision not to contribute the promised and needed $35 million, by Nations' ultimate failure to do the promised bond offering, its failure to build the schools it purported to have plans to build, and its failure to generate operating income as shown in its 2007 and 2008 financial statements;

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

(c)    Nations failed to observe corporate formalities, such as holding scheduled board meetings, issuing shares of stock and providing audited financial statements to Emet as required by the terms of the Subscription Agreement.

137.    Emet is therefore entitled to recover any damages and any other relief the Court deems just and proper from GEMS, the alter ego of Nations.

## COUNT XII—BREACH OF CONTRACT (SETTLEMENT AGREEMENT)

### (As Against Varkey)

138.    All previous allegations are incorporated herein.

139.    Defendant Varkey and Emet entered into a Settlement Agreement on February 17, 2010, pursuant to which Emet released Nations and Varkey from any legal claims arising from the dispute between the parties over the Subscription Agreement in consideration for Varkey's promise to pay Emet $5,000,000, plus interest at an agreed upon rate, as memorialized in a Promissory Note attached to the Settlement Agreement.

140.    Emet performed in all of its requirements under the terms of the Settlement Agreement.

141.    Defendant Varkey breached the terms of the Settlement Agreement by failing to pay the amount due on the date specified by the Settlement Agreement and attached Promissory Note.

142.    Emet was damaged by Varkey's failure to perform under the terms of the Settlement Agreement and attached Promissory Note.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

143.    Emet is therefore entitled to damages caused by this wrongful conduct, in an amount to be determined at trial, but in no less than the amount of principal and interest owed to Emet by the terms of the Promissory Note, plus any other relief the Court deems just and proper.

## COUNT XIII—BREACH OF PROMISSORY NOTE

### (As Against Varkey)

144.    All previous allegations are incorporated herein.

145.    Defendant Varkey executed a Promissory Note on February 17, 2010, by which he promised to pay Emet $5,000,000, plus interest, on May 31, 2010.

146.    Defendant Varkey defaulted on the Promissory Note by failing to pay the amount due on the date specified by the Promissory Note.

147.    Emet was damaged by Varkey's failure to perform under the terms of the Promissory Note.

148.    Emet is therefore entitled to damages caused by this wrongful conduct, in an amount to be determined at trial, but in no less than the amount of principal and interest owed to Emet by the terms of the Promissory Note, plus any other relief the Court deems just and proper.

## COUNT XIV—ACCOUNTING

### (As Against Nations, GEMS and GEMS Americas)

149.    All previous allegations are incorporated herein.

150.    By virtue of the promises and agreements described above, Emet is entitled to a full accounting of all sales, transfers, assignments, liens, encumbrances, or other dispositions of any and all Nations, GEMS and GEMS Americas funds, assets, and projects since the date of the company's formation, and a full accounting of all ownership interests that have been issued to anyone in any entity or entities that currently own or formerly owned such assets or projects.

- 41 -

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

## PRAYER FOR RELIEF
## AND DEMAND FOR JURY TRIAL

WHEREFORE, plaintiffs hereby demand a trial by a jury and judgment against defendants as follows:

(a)   Damages caused by the defendants' securities fraud, control person liability, common law fraud, fraud in the inducement, aiding and abetting fraud, negligent misrepresentation, breaches of contract, constructive trust, unjust enrichment, breach of fiduciary duty and successor liability;

(b)   An accounting of all sales, transfers, assignments, liens, encumbrances, or other dispositions of any and all Nations, GEMS and GEMS Americas funds, assets and projects since the date of the company's formation, and all ownership interests that have been issued to anyone in any entity or entities that currently own or formerly owned such assets or projects;

(c)   Specific performance of the terms of the promissory note;

(d)   Plaintiffs' costs, expenses, and attorneys' fees incurred in connection with this action to the maximum extent permitted by law; and

(e)   Such other and further relief as the Court may deem appropriate.

CONTAINS CONFIDENTIAL INFORMATION
REDACTED FOR PUBLIC FILE

Date:   New York, New York
          August 19, 2010

Respectfully submitted,

By: _____
       Hillary Richard (HR – 6941)
       Jessica Holloway
       Matthew Popowsky
       BRUNE & RICHARD LLP
       80 Broad Street
       New York, New York 10004
       Tel:  (212) 668-1900
       Fax:  (212) 668-0315
       *Counsel for plaintiff*
       *Emet Investments, LLC*

# EXHIBIT 1

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT"), OR ANY STATE SECURITIES LAWS, AND HAS BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. THIS NOTE MAY NOT BE OFFERED FOR SALE, SOLD OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO A REGISTRATION STATEMENT UNDER THE ACT OR, IN THE ABSENCE THEREOF, AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE PAYEE THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR ANY APPLICABLE STATE SECURITIES LAWS.

## PROMISSORY NOTE

US$5,000,000.00                                                        Feburary 17, 2010

　　　　FOR VALUE RECEIVED, Sunny Varkey, a Dubai resident (the "Maker"), promises to pay to the order of Emet Investments, LLC, a Nevis limited liability company (the "Payee"), with an address at c/o Counselor Trust reg., Zollstrasse 9, P.O. Box 1611, FL-9490 Vaduz, Liechtenstein, the principal sum of US$5,000,000.00, together with interest as set forth below, in accordance with the provisions of this Note. This Note was issued pursuant to a Settlement Agreement dated February 17, 2010 (the "Settlement Agreement"), between the Maker and the Payee and all provisions thereof are hereby incorporated herein in full by reference. All capitalized terms used herein and not otherwise defined shall have the meanings given thereto in the Settlement Agreement.

　　　　1.　　Interest.  Interest on the outstanding principal amount hereof shall accrue from July 1, 2008 to and including the day when the principal is paid in full, at the annual rate of 7.0%, compounded annually. An amortization and payment schedule is attached as "Exhibit A."

　　　　2.　　Payment.  The outstanding principal amount of this Note, together with all accrued and unpaid interest thereon, shall be due and payable on May 31, 2010 (the "Maturity Date"). Unless the Payee otherwise agrees, any payment shall be applied first to accrued interest and then to principal.  All payments to be made to the Payee pursuant to this Note shall be made in the lawful money of the United States in immediately available funds which shall be delivered to the Payee by wire transfer in accordance with the instructions attached as "Exhibit B" or in such other manner as the Payee or any subsequent holder may designate to the Maker in writing.

　　　　3.　　Voluntary Prepayments.  The Maker shall have the right to prepay all or any part of this Note at any time, or from time to time, without premium or penalty.

　　　　4.　　Events of Default.  If any of the following events (each individually an "Event of Default" and collectively "Events of Default") shall occur, the Payee may, by written notice to the Maker, declare this Note, all interest hereon, and all other amounts payable hereunder to be due and payable, whereupon the same shall become immediately due and payable:



(a)   The Maker fails to pay the principal amount, accrued interest, or any other amount payable under this Note within five calendar days of when such principal amount, accrued interest, or other amount is due;

(b)   The Maker breaches any other obligation to the Payee hereunder or under the Settlement Agreement and such breach is not cured within 20 days after written notice thereof by the Payee to the Maker;

(c)   Any representation or warranty of the Maker under the Settlement Agreement shall prove to have been materially false, inaccurate, or misleading on the date when made;

(d)   The Maker admits in writing its inability to pay its debts as they become due, or makes an assignment for the benefit of creditors;

(e)   Any proceedings instituted by or against the Maker seeking either (i) an order for relief with respect to, or reorganization, arrangement, adjustment, or composition of, its debts under the United States Bankruptcy Code or under any other law relating to bankruptcy, insolvency, reorganization, or relief of debtors or (ii) the appointment of a trustee, receiver, or similar official for the Maker or for any substantial part of his assets; provided, however, that, in the event of any proceedings instituted against the Maker, no Event of Default shall be deemed to have occurred unless the proceeding is not dismissed or stayed, or any appointment resulting from any such case is not vacated, within 60 days of the commencement of such case;

(f)   The entry of a judgment or filing of a federal tax lien against the Maker in an amount of $500,000.00 or more which is not discharged within 30 days unless such judgment is being appealed and a stay of execution has been granted pending resolution of such appeal;

(g)   The Maker fails to pay when due any indebtedness in the aggregate amount of $5,000,000.00 or more if the effect of such default is to cause the acceleration thereof prior to its expressed maturity; or

(h) The death of the Maker.

5.   Default Interest. If this Note is accelerated by the Payee pursuant to Section 4 or any amounts due hereunder are not paid when due, all amounts so accelerated or overdue shall thereafter bear interest at an annual rate of 12.0% (the "Default Rate") until paid in full. The Default Rate shall continue to apply whether or not judgment shall be entered on this Note. The Payee shall also have any other rights which the Payee may have pursuant to this Note or applicable law.

6.   Waiver of Procedural Defenses. The Maker irrevocably and expressly waives promptness, diligence, presentment, demand, protest, proof, notice of acceptance, notice of non-payment, notice of non-performance, notice of non-observance, notice of dishonor, notice of protest, and any and all other notices and demands whatsoever, whether required to be given by statute, rule of law, or otherwise, with respect to this Note.



7.   Cancellation.  After all principal, accrued interest, and all other amounts payable under this Note have been paid in full, this Note shall be surrendered by the Payee to the Maker for cancellation and shall not be reissued.

8.   Payee's Expenses.  If an Event of Default shall occur, the Maker agrees to pay on demand all reasonable costs and expenses (including, without limitation, attorneys' fees and disbursements of counsel) incurred by the Payee in determining his rights under, administering and/or enforcing this Note (including, without limitation, attorneys' fees incurred and to be incurred in any bankruptcy proceeding involving the Maker). All such costs and expenses shall bear interest, payable on demand, from the date of payment thereof by the Payee until paid in full by the Maker, at the rate(s) from time to time applicable to the principal of this Note, including any rate applicable during the existence of an Event of Default or any event which with notice or passage of time or both would constitute an Event of Default.

9.   Usury Laws.  It is the intention of the Maker and the Payee to conform strictly to all applicable usury laws now or hereafter in force, and any interest payable under this Note shall be subject to reduction to the amount not in excess of the maximum legal amount allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction over such matters. If the maturity of this Note is accelerated by reason of an election by the Payee resulting from an Event of Default, voluntary prepayment by the Maker, or otherwise, then earned interest may never include more than the maximum amount permitted by law and any interest in excess of the maximum amount permitted by law shall be canceled automatically and, if theretofore paid, shall at the option of the Payee either be rebated to the Maker or credited on the principal amount of this Note, or if this Note has been paid, then the excess shall be rebated to the Maker. The aggregate of all interest (whether designated as interest, service charges, points, or otherwise) contracted for, chargeable, or receivable under this Note shall under no circumstances exceed the maximum legal rate upon the unpaid principal balance of this Note remaining unpaid from time to time. If such interest does exceed the maximum legal rate, it shall be deemed a mistake and such excess shall be canceled automatically and, if theretofore paid, shall at the option of the Payee either be rebated to the Maker or credited on the principal amount of this Note, or if this Note has been repaid, then such excess shall be rebated to the Maker.

10.   Amendment.  This Note may not be amended, changed, modified, or terminated, and no provision hereof may be waived, except in a written instrument signed by the party against whom enforcement of such amendment, change, modification, termination or waiver is sought.

11.   Governing Law.  This Note shall be governed by, and interpreted and construed in accordance with, the laws of the State of New York, without regard to the principles of conflict of laws.

12.   Jurisdiction.  Any suit or proceeding relating to this Note shall be commenced exclusively in state or federal courts located in New York County, New York, and each party irrevocably consents to the exclusive jurisdiction and venue of such courts.

13.   Severability.  If any provision of this Note shall be finally determined to be unenforceable, invalid, or ineffective in any action, suit, or proceeding, such provision shall be



automatically reformed and construed so as to be valid, operative, and enforceable to the maximum extent permitted by law or equity while preserving its original intent.   The determination that any provision of this Note is unenforceable, invalid, or ineffective in any action, suit, or proceeding shall not affect the enforceability of the remainder of this Note.

14.   No Waiver.  No delay or failure on the part of the Payee in exercising any right hereunder or under any guarantee of or security or other agreement securing this Note shall operate as a waiver of such right or of any other right of the Payee, nor shall any waiver or relinquishment by the Payee of any right or power hereunder or under any guarantee of or security or other agreement securing this Note at any one time or more times be deemed a waiver or relinquishment of such right or power at any other time or times.

15.   Headings.  The headings in this Note are inserted as a matter of convenience only and shall not be used to interpret or construe any provision of this Note.

16.   Notices.  Any notice, consent, demand, or communication required or permitted to be given by any provision of this Note shall be made in the manner specified in Section 11 of the Settlement Agreement.

17.   Cumulative Remedies.  The rights and remedies expressly specified in this Note (a) are cumulative and not exclusive of any other rights or remedies which the Payee otherwise has or would have, (b) may be pursued singularly, successively, or together at the sole discretion of the Payee, and (c) may be exercised as often as the occasion therefore shall occur.

18.   Transfer of Note.  This Note may not be assigned or otherwise transferred without the prior written consent of the Payee.  Any purported assignment in contravention of this Section shall be null and void.

IN WITNESS WHEREOF, the Maker has executed and delivered this Note as of the date first written above.

_____
Sunny Varkey, Maker

THE STATE OF NEW YORK        §
                             §
COUNTY OF _____      §

This instrument was acknowledged before me on the _____ day of _____, 2010, by Sunny Varkey, as Maker.

_____
Notary Public, State of New York

4

## EXHIBIT A

### AMORTIZATION AND PAYMENT SCHEDULE

Compound Period:  Annual

Nominal Annual Rate:  7.000 %

CASH FLOW DATA

|   | Event | Date | Amount | Number | Period | End Date |
|---|-------|------|--------|--------|--------|----------|
| 1 | Loan | 07/01/2008 | 5,000,000.00 | 1 | | |
| 2 | Payment | 05/31/2010 | 5,692,693.15 | 1 | | |

AMORTIZATION SCHEDULE - Normal Amortization

|  | Date | Payment | Interest | Principal | Balance |
|--|------|---------|----------|-----------|---------|
| Loan | 07/01/2008 | | | | 5,000,000.00 |
| 2008 Totals | | 0.00 | 0.00 | 0.00 | |
| | | | | | |
| 1 | 05/31/2010 | 5,692,693.15 | 692,693.15 | 5,000,000.00 | 0.00 |
| 2010 Totals | | 5,692,693.15 | 692,693.15 | 5,000,000.00 | |
| | | | | | |
| Grand Totals | | 5,692,693.15 | 692,693.15 | 5,000,000.00 | |

## EXHIBIT B

### WIRE TRANSFER INSTRUCTIONS

#### FOR A U.S. DOMESTIC WIRE:

**BENEFICIARY BANK:**
**ABA#:**
**SWIFT CODE:**
**FURTHER CREDIT TO:**

**ACCOUNT #:**
**SPEC. INSTRUCTIONS:**
**REFERENCE:**



#### FOR AN INTERNATIONAL WIRE:

**US CORRESPONDENT BANK:**

**ABA#:**
**SWIFT CODE:**

**BENEFICIARY BANK**

**ABA#:**
**SWIFT CODE:**
**FURTHER CREDIT TO:**

**ACCOUNT #:**
**SPEC. INSTRUCTIONS:**
**REFERENCE:**





6